IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GARY WAYNE GUILLIAMS                                             PLAINTIFF

v.                          Civil No.  5:16-cv-05170

SHERIFF TIM HELDER;                                          DEFENDANTS
MAJOR RANDALL DENZER;
DR. ROBERT KARAS; and
KARAS CORRECTIONAL HEALTH, PLLC

## OPINION

Plaintiff, Gary W. Guilliams, filed this action pursuant to 42 U.S.C. §1983.  He proceeds *in forma pauperis.*  Although he was proceeding *pro se* when he filed the original Complaint, Plaintiff's Motion for Appointment of Counsel was granted and an attorney, Christopher William Nanos, was appointed to represent him (ECF No. 42).

The case is before the Court on the Motion for Summary Judgment (ECF No. 66) filed by Sheriff Helder and Major Randall Denzer (the "County Defendants").  Plaintiff has responded (ECF Nos. 74, 75) to the Motion.

A Motion for Summary Judgment (ECF No. 69) has also been filed by Dr. Karas and Karas Correctional Health, PLLC (the "Medical Defendants").  Plaintiff has responded (ECF Nos. 74, 75) to the Motion.  Additionally, the Medical Defendants filed a reply brief (ECF No. 76).  The Motions are ready for decision.

Plaintiff maintains he was denied adequate medical care while incarcerated at the Washington County Detention Center ("WCDC").  Specifically, Plaintiff maintains he was denied adequate pain medication, a splint, a referral to an orthopedic doctor, and surgery for his fractured

right wrist and associated numbness of his hand.  Plaintiff also brings supplemental state tort claims of negligence and malpractice.

## I.  BACKGROUND

On February 22, 2016, when Plaintiff was walking in front of the IGA grocery store he "was knocked over by a person running from the store."  (ECF No. 74-10 at 1).  He hit the ground injuring his right wrist.  (*Id*).  That same day, Plaintiff reported being assaulted by several individuals from the Salvation Army at the IGA grocery store.  (ECF No. 68-11 at 9).  Plaintiff was arrested for public intoxication and transported to the WCDC where the jail nurse decided not to accept the Plaintiff.  (*Id*).  He was cited and released from custody. (*Id*).

Central Emergency Medical Services ("CEMS") responded to the WCDC.  (ECF No. 68-7 at 5).  Plaintiff told the CEMS paramedics that "someone assaulted him, twisting his arm behind his back."  (*Id*).  Swelling and a possible deformity in the right wrist was noted.  (*Id*).  Plaintiff also reported lateral neck pain, right knee pain, and being short of breath.  (*Id*).  Plaintiff was transported to the emergency room ("ER") at Washington Regional Medical Center (WRMC).  (*Id*).

Plaintiff's x-rays showed: "an impacted, mildly comminuted distal radial fracture.  No evidence of intra-articular extension.  Fracture of the ulnar styloid process.  There is some dorsal angulation of the distal radial fracture.  Old fracture of the mid scaphoid bone."  (ECF No. 68-9 at 34).  Plaintiff was intoxicated, uncooperative, and abusive to staff.  (*Id.* at 18-19).  No attempt was made to reduce the fracture due to his conduct.  (*Id*).  A splint, ace bandage, and sling were applied.  (*Id.* at 18).  His discharge diagnosis was Colles' fracture, no reduction required.  (*Id.* at 16).  Plaintiff was advised that Dr. Coker, an orthopedic physician, wanted to see him in two days.  (*Id.* at 12).  He was told to call for an appointment time.  (*Id*).  He was prescribed Norco.  (*Id*).

Following this visit, Plaintiff testified he went to Ozark Orthopaedic. (ECF No. 71-1 at 21-22). Because he did not have insurance, Plaintiff testified he was turned away. (*Id.* at 22).

On February 25, 2016, Plaintiff reported to the Fayetteville Police Department ("FPD") that someone "pushed him down, causing him to hurt his right arm." (ECF No. 68-11 at 14). CEMS responded and Plaintiff reported being pushed from behind and that he hurt his arm again. (ECF No. 68-7 at 11). Plaintiff was in pain and his right wrist was swollen. (*Id*). An attempt was made to splint his wrist but he would not let them. (*Id*).

Plaintiff was transported by ambulance to Physician's Specialty Hospital ("PSH"). (ECF No. 68-7 at 12). It was noted Plaintiff fell and injured his right arm and had a previous fracture of his right wrist. (ECF No. 68-8 at 14). It was also noted that Plaintiff had a splint after the initial injury but took it off because it was hurting him, and that he had the odor of alcohol. (*Id*). Plaintiff was diagnosed with fractures of the distal radius, the ulna and scaphoid. (*Id.* at 22). A sugar tong splint was applied and two four inch ace bandages. (*Id.* at 14). He was also placed in a sling. (Id). Plaintiff was prescribed Ultram. (*Id.* at 27).

On February 29, 2016, Plaintiff stated a man pushed him down and reinjured his wrist again. (ECF No. 68-7 at 17). CEMS was dispatched. (*Id*). Plaintiff indicated he had twice been given a splint but the splints were too tight and he removed them. (*Id*). The paramedics attempted to place an ice pack on his wrist but Plaintiff refused. (*Id*). He also refused a splint. (*Id*). Plaintiff was transported to WRMC. (*Id*).

Plaintiff complained of right wrist swelling and pain for the last nine days and needed his arm fixed. (ECF No. 68-9 at 45). He stated he took the splint off because it was hurting, and he was not wearing his sling. (*Id*). He said he tried to see the orthopedic doctor, but he was homeless and could not pay. (*Id*). He was told there was not much else that could be done since he had

already been seen there, and that he would have to go to the lobby and wait his turn to be seen. (*Id*). Plaintiff became belligerent and the intake worker called security. (*Id*). Plaintiff left the ER area without being treated and was found sleeping in the chapel. (*Id.* at 44). Plaintiff was escorted from the hospital by law enforcement. (*Id*).

On March 2, 2016, Plaintiff was seen at Ozark Orthopaedic by Larrah Jenkins, a Physician's Assistant for Dr. C. Noel Henley. (ECF No. 71-5 at 1). It was noted Plaintiff was not wearing his splint because it was too uncomfortable, but he was using an Ace wrap. (*Id*). The right wrist was noted to be mildly swollen with: "notable deformity of the distal radius, has limited flexion and extension, limited pronation and supination. He has good gentle range of motion of the fingers. Sensation is grossly intact." (*Id*). X-rays were taken and showed "a fracture of the distal radius with some dorsal angulation apex volar." (*Id*). The plan was to put him in a volar splint and have him follow-up with Dr. Henley in the next seven to 10 days. (*Id*).

On March 6, 2016, Plaintiff called 911 from a McDonald's restaurant. (ECF No. 68-7 at 24). CEMS responded. (*Id*). Plaintiff complained his right wrist had been hurting for the past two weeks since he broke it when he fell. (*Id*). Swelling was noted in the right wrist with no other signs of injury. (*Id*). Plaintiff rated his pain as a ten out of a ten. (*Id*). A sling was applied and he was transported to WRMC. (*Id*).

Plaintiff advised that he had been diagnosed with a right wrist fracture, had been using the splint off and on, had not called for a follow up with an orthopedic physician, and had not been able to fill his Norco prescription because of lack of money. (ECF No. 68-9 at 55). Plaintiff smelled of alcohol. (*Id*). He was diagnosed with a "mildly comminuted distal radial fracture." (*Id.* at 57). A slightly increased displacement was noted compared to the prior study. (*Id.* at 63). A splint was applied to his right forearm along with a four inch ace wrap and a sugar tong posterior

mold was applied and the wrist immobilized.  (*Id.* at 59).  Plaintiff was told to follow up with Dr. Heinzelmann, an orthopedic surgeon.  (*Id.* at 54).  Plaintiff was released but would not leave.  (ECF No. 68-2 at 5).  He was yelling at staff and wandering around the waiting room.  (*Id*).

The police were called and Plaintiff was transported to the WCDC.  (ECF No. 68-2 at 3-4; ECF No. 68-11 at 20).  He was charged with public intoxication and disorderly conduct.  (*Id*. at 18, 21).  He was booked in at 9:57 a.m. and released at 2:07 p.m. that same day.  (ECF No. 68-2 at 3-4).  His medical complaints/injuries were listed as "broken rt. arm in cast."  (*Id*).

On March 13, 2016, Plaintiff was charged with public intoxication and criminal trespass and booked into the WCDC at 1:05 p.m.  (ECF No. 68-2 at 11; ECF No. 68-11 at 21, 25).  He was released the following day at 1:50 p.m.  (ECF No. 68-2 at 12).  Intake documents indicate he had three ace bandage wraps in his possession, but no splint or sling was listed with his other property.  (*Id.* at 13).  His medical complaints/injuries were listed as "hurt right wrist."  (*Id*).

On April 4, 2016, CEMS responded to a call to the WRMC parking lot for a possible arm fracture.  (ECF No. 68-7 at 30).  Plaintiff complained of right wrist pain.  (*Id*).  He reported having broken his arm about a month ago.  (*Id*).  He said he had been seen at the ER and a cast was put on.  (*Id*).  He indicated the cast was uncomfortable and he removed it but the pain was now getting worse and he wanted to go to the ER again.  (*Id*).  It was noted that swelling and deformity of the right wrist were present, but Plaintiff was moving it without obvious difficulty.  (*Id*).  Sensory and motor function in the injured arm were found to be intact, and there was good capillary refill in the finger tips.  (*Id*).

The FPD stated that Plaintiff was not permitted on WRMC property and would have to go to Northwest Medical Center in Springdale.  (ECF No. 68-7 at 30).  Plaintiff was transported to the ER at the Northwest Medical Center.  (*Id*).

Plaintiff's diagnosis was "right distal radius fracture and right scaphoid fracture." (ECF No. 71-7 at 29). He was given a prescription for Tylenol with Codeine and told to follow-up with a physician within one to two days and with Dr. John Heim within three to five days. (*Id*).

Plaintiff points out that during this entire time since his injury he was homeless, had no insurance, and was suffering from major depressive disorder. (ECF No. 74-10 at 3). He indicates he had to carry his belongings with him, slept on the street, and it was difficult to wear the splint because it caused his arm to swell and it was painful. (*Id*). Plaintiff indicates he would take if off for a while and when the pain went away he would put it back on. (*Id*).

On April 5, 2016, Plaintiff was identified as having run from the woods and threatened two people with a kitchen knife. (ECF No. 68-2 at 23; ECF No. 68-11 at 34). He was arrested by the FPD and charged with aggravated assault, carrying a prohibited weapon, and public intoxication. (ECF No. 68-11 at 26). He was booked into the WCDC on April 6, 2016 at 12:31 a.m. and remained there until May 19, 2016, when he was released. (ECF No. 68-2 at 20-21).

One of the intake forms lists his medical complaints/injuries as: "depression, broken rt. arm." (ECF No. 68-2 at 30). Plaintiff was seen at booking by a jail nurse. (ECF No. 71-6 at 9). It was noted that Plaintiff's right wrist had been broken over a month ago. (*Id).* Plaintiff reported constantly being in pain. (*Id*). Plaintiff's wrist was noted to be deformed, and Plaintiff stated he had been told it would have to be re-broken and set back in place. (*Id*). Plaintiff was able to move his fingers. (*Id*). Plaintiff was added to doctor call. (*Id).*

Detainees of the WCDC may submit medical complaints/requests via an electronic kiosk. (ECF No. 68-1 at 2). The requests are reviewed by medical personnel. (*Id*). Since January 1, 2016, Washington County has contracted (ECF No. 74-4) with Karas Correctional Health, PLLC ("KCH") (ECF No. 74-2) to provide medical services at the WCDC. (ECF No. 68-1 at 3; ECF

No. 68-5 at 2).  Dr. Karas is the jail doctor, and he or his personnel are the primary medical care providers.  (ECF No. 68-4 at 7).

Plaintiff submitted his first request on April 6, 2016.  He stated "broke arm [medical] help please."  (ECF No. 68-3 at 1).  He was told he had submitted it incorrectly and needed to submit the request to medical.  (*Id.* at 2).  He submitted a second request that same day saying he was in a lot of pain from his broken arm.  (*Id*).  He was again told to submit the request to medical.  (*Id*).  The requests were reassigned to medical.  (ECF No. 68-3 at 1).  On that same day, doctor call was declined because there was "[n]o indication for MD at this time."  (ECF No. 71-9 at 9).

On April 7, 2016, Plaintiff was asked if he broke his arm before or after he was incarcerated and whether he had told anyone that had been passing medication.  (ECF No. 68-3 at 1).  Plaintiff submitted his next request on April 7, 2016, stating he needed to see a nurse or doctor about having his arm re-broken because it had grown back together wrong.  (*Id.* at 2).  Plaintiff responded to the question of when he had broken his arm by saying that he broke it before he was incarcerated.  (*Id.* at 1).  He also noted that the nurse passing medication merely said she would check into it.  (*Id.* at 1).

On April 8, 2016, Plaintiff submitted two requests saying he was in pain and needed medical help.  (ECF No. 68-3 at 3).  He was again told to write to medical and the requests were closed.  (*Id*).  He submitted a third request saying he needed his broken arm "looked at ASAP."  (*Id*).  He was added to doctor call.  (ECF No. 71-6 at 9).  He was seen by Kelley Oliver, a nurse practitioner.  (ECF No. 71-6 at 10; ECF No. 74-3 at 71).  She noted Plaintiff had been non-compliant with the splint and was refused a visit with the orthopedic doctor due to inability to pay.  (ECF No. 71-6 at 10).  She noted "right wrist deformity, increase pain with flexion/extension, fingers pink, sensory/motor intact and points straight, no edema/discoloration at wrist."  (*Id*).  She ordered an

x-ray, indicated they would request his records from WRMC and Physicians Specialty Hospital ("PSH"), and started Plaintiff on Naproxen and ice. (*Id*).

On April 8, 2016, Plaintiff submitted a fourth request asking for something for pain. (ECF No. 68-3 at 4). On April 11, 2016, he was told he had been added to the nurse call list. (*Id*). On April 11, 2016, Plaintiff complained that he had been taking Tramadol, one every four hours, and at the WCDC was only given one Naproxen in the morning and one at night. (ECF No. 68-3 at 4). He indicated he was suffering unnecessary pain and could not sleep. (*Id*). He was seen by a jail nurse who noted he wanted something stronger for pain and wanted his wrist fixed now he had Medicaid. (ECF No. 71-6 at 10). He was told he would be added to the "doctor call, but we do not give anything stronger than naproxen or [T]ylenol." (ECF No. 68-3 at 4). On April 12, 2016, he was told the advance practice nurse had approved an increase in the Naproxen dosage but that he would not be prescribed any stronger pain medication. (*Id.* at 5). He was not seen by the doctor. (*Id*).

On April 11, 2016, Plaintiff was asked if he was seen by a doctor when he broke his wrist. (ECF No. 68-3 at 1). That same day, he responded that he was seen at "Regional." On April 11, 2016, a notation was made that plaintiff had been "seen via medical." (*Id*). On April 12, 2016, Dr. Karas read the x-ray and noted "a distal comminuted radius fracture." (ECF No. 71-8 at 75-76). Dr. Karas testified they treated Plaintiff's injury as a "non-acute injury and a non-emergent condition." (*Id.* at 79). In his words:

> "that horse was out of the barn. He'd been six weeks without treatment of it. The procedure he would need – the surgery he's going to need, whether we gave it to him the first day he got in there or whether he gets it six months later, the surgery treatment and outcome are going to be the same."

(*Id*).

Dr. Karas testified they could not "fix" all the inmates medical problems and had to be judicious about what they treated. (ECF No. 71-8 at 80). He noted there were other inmates in the detention center with broken bones they did not send to an orthopedic doctor. (*Id*). He stated that Plaintiff was in and out of the jail multiple times, fell frequently, failed to wear the splints provided, and failed to follow-up on the recommendations made by the different hospital physicians he had seen. (*Id.* at 80-81, 89). Dr. Karas testified that Plaintiff was aware that his wrist was going to have to be re-broken and he was going to need surgery. (*Id.* at 81). Dr. Karas testified they also considered whether they were able to control an inmate's pain, such as they did with Plaintiff, by providing a second mat, a 24 hour mat, a second blanket, the pain medication they had available, and an Ace wrap. (*Id.* at 82-83). Dr. Karas indicated they considered how long the inmate was going to be incarcerated (*Id.* at 82), and whether the problem was one that "once they get out and their insurance kicks back in, they [can] go get it fixed." (*Id*). Another consideration mentioned by Dr. Karas was whether the patient would follow-up and take good care of themselves, go to physical therapy or rehab, so they would have a good outcome from the surgery. (*Id.* at 104). Dr. Karas testified they tried to be fair and consistent among inmates with similar types of injuries. (*Id.* at 83).

In general, Dr. Karas testified that splints are a security risk which is why they usually use Ace wraps. (ECF No. 71-8 at 84). If an inmate has a splint, they have to be in isolation or medical holding. (*Id.* at 86). If there is a question regarding a medical device's safety, Dr. Karas testified detention center staff would look at it first. (*Id*). Dr. Karas testified detention center staff can refuse "to allow that care" (*Id.* at 87); however, Dr. Karas testified that immobilizing Plaintiff's wrist in April of 2016 might have decreased Plaintiff's pain. (*Id.* at 88, 90).

On April 16, 2016, Plaintiff submitted a request stating that his arm was broken in three places and asking why he had not been taken to an orthopedic doctor. (ECF No. 68-3 at 6). Since he had been in jail, Plaintiff states his hand had gone numb and his thumb felt like it was on fire. (*Id*). He asked that something be done before he lost the use of his hand. (*Id*). He stated he was in a lot of pain. (*Id*). In response, he was told to write to medical and was asked if he could not see the medical category on the kiosk. (*Id*). Plaintiff submitted another request that same day asking for help to get to the orthopedic doctor. (*Id*). He stated his hand was numb and his thumb felt on fire. (*Id*). That day, a prescription was added for "24/7 bed rest on mat." (ECF No. 71-6 at 12).

On April 18, 2016, he was told he was placed on nurse call. (ECF No. 68-3 at 6). On April 18, 2016, Plaintiff submitted a request asking if he could keep his blanket since it was so cold in his cell. (ECF No. 68-3 at 7). He said the cold made his arm hurt twice as bad and that he had screws in his ankle the cold bothered too. (*Id*). He indicated he could not sleep because he hurt from head to toe. (*Id*).

On April 18, 2016, Plaintiff also asked when he was going to be taken to see his doctor at the "old regional hospital." (ECF No. 68-3 at 7). In response, he was told that the nurse did not believe they took people to see their own doctors. (*Id*). Plaintiff was asked why he wanted to see his doctor. (*Id*). Plaintiff replied that he wanted to see his doctor about his broken arm. (*Id.* at 8).

On April 19, 2016, he was told he was placed on doctor call. (ECF No. 68-3 at 7). That same day, a doctor visit was declined because Plaintiff had been put on a "24 hr mat." (ECF No. 71-6 at 12).

On April 20, 2016, Plaintiff asked again when he would be taken to his doctor. (ECF No. 68-3 at 8). In response, he was told that they did not transport detainees to outside doctors. (*Id*).

On April 22, 2016, Plaintiff was given a prescription for a "24 hr 2nd mattress." (ECF No. 71-6 at 14). That same day, the prescription for 24/7 bed rest on mat was discontinued and Plaintiff was given a prescription for a 24 hour mat instead. (*Id.* at 13).

On April 27, 2016, Plaintiff submitted a request about a number of issues and stated his wrist hurt and asked someone to do something. (ECF No. 68-3 at 11). He was told to submit a separate request to medical. (*Id*). He was reassigned to segregation by medical staff because of his "hand issue" on April 28, 2016. (ECF No. 71-6 at 14).

On April 29, 2016, Plaintiff asked again if he could keep his blanket during the day because his wrist hurt even more in the cold air. (ECF No. 68-3 at 12). He was told he was on nurse call. (*Id*). He was prescribed "24/7 bed rest on mat," and a "24 hr 2nd mattress." (ECF No. 71-6 at 14-15). His request to keep his blanket was declined by the nurse because the "[j]ail is kept at an adequate temp." (*Id.* at 16). On May 3, 2016, his "24 hr 2nd mattress" was discontinued and he was prescribed again "24/7 bed rest on mattress." (*Id*).

On May 5, 2016, Plaintiff was added to doctor call. (ECF No. 71-6 at 18). On May 6, 2016, doctor call was declined. (*Id*). Notes indicate: "[t]he xray, wrmc, and psh records were reviewed. Detainee was instructed to have surgery prior to detention. The detainee reported Ozark orthopedic refused to see him related to not having a method to pay. The detainee has no compromise to circulation, sensory and motor intact." (*Id*).

On May 6, 2016, Plaintiff was told:

> "Mr. Guilliams per the provider, as you know you were told by Washington Regional Medical Center, Physician Specialty Hospital and Ozark Orthopaedics th[a]t you needed surgery prior to you[r] arrest. I will start you on Seroquel and continue Naproxen and Tylenol. . . . I will see what options we have on getting your arm fixed."

(ECF No. 68-3 at 13).

On May 11, 2016, Plaintiff was added to doctor call. (ECF No. 71-6 at 18). Plaintiff was seen by Kelly Oliver. Her notes reflect:

> "Visited with detainee. Reports his right wrist is very painful and is requesting surgery. I explained to him that his er visit to both psh and wrmc mentioned he needed surgery. But that it was not emergent in nature or it would have been done in the emergency room on either occasion. He verbalized understanding and admitted he didn't follow up with Ozark orthopedic related to needing to pay for services. I informed him I would provide him with a ace wrap and/or coban to apply pressure to the area to help with swelling and comfort. . .. assess: right wrist deformity, capillary refill to all fingers less than 2 sec, sensory/motor intact, grip strength weaker than left side."

(ECF No. 71-6 at 19). He was also given a prescription for a 24/7 blanket. (*Id*).

On May 13, 2016, Plaintiff asked if medical staff would write a letter to the courts stating that he needed to go to the doctor. He said his arm needed to be broken and reset. (ECF No. 68-3 at 14). He was told they did not write letters to the court and that "hopefully you will be released before too much time has passed." (*Id*). As noted above, Plaintiff was released on May 19, 2016.

On the evening of May 24, 2016, the FPD was called to Seven Hills. (ECF No. 68-11 at 42). Plaintiff was accused of having pushed a man down causing him to hit his head on a dresser. (*Id.* at 43). Plaintiff was placed under arrest for second degree battery. (*Id.* at 42). Plaintiff was booked into the WCDC on May 25, 2016. (ECF No. 68-2 at 34). Plaintiff remained incarcerated until August 1, 2016. (*Id.* at 37). One of the intake forms lists Plaintiff's medical complaints/injuries as: "broken right wrist." (ECF No. 68-2 at 40).

On May 26, 2016, Plaintiff stated he had not been taken to the doctor during his last incarceration and was in pain day and night. (ECF No. 68-3 at 15). On June 6, 2016, note was made that Plaintiff had not been seen by the doctor because he would be started on medication for his wrist pain, given a wrist exercise list, and ice would be ordered. (ECF No. 71-6 at 4). A

prescription for Naproxen, 220 mg, twice a day, was added as was a prescription for ice for three days. (*Id.* at 3).

While he was on release, Plaintiff apparently scheduled an appointment to see a doctor at Ozark Orthopaedic on June 9, 2016, and he asked if he would be taken to the appointment. (ECF No. 68-3 at 18-19). On June 6, 2016, medical staff noted that Plaintiff would be going to an orthopedic appointment (ECF No. 71-8 at 113-14). On June 7, 2016, jail staff told him he would be going to an outside orthopedic appointment. (ECF No. 68-3 at 19).

Dr. Karas testified that this was in error. (ECF No. 71-8 at 115). He stated that his review of the Plaintiff's medical records did not indicate that Plaintiff was approved to go to an outside appointment. (*Id*). Further, Dr. Karas pointed out that when the chart was reviewed by the medical administrator, Landon Harris, he noted that Plaintiff would not be going to the appointment. (ECF No. 71-6 at 4). On June 10, 2016, Plaintiff was told he could only go to an outside appointment when authorized by the jail medical provider and that in such cases he would not know the date or time of the appointment. (ECF No. 68-3 at 20). Dr. Karas testified the facility policy is that no one can be taken to an appointment that was scheduled prior to their detention for safety reasons. (ECF No. 71-8 at 108). The appointment was not rescheduled because they viewed the Plaintiff's problems as non-acute and not necessitating outside treatment at the time. (*Id*).

On June 10, 11 and 12, 2016, Plaintiff complained that he was in pain, his fingers were numb, his thumb felt like it was on fire, and he could not sleep. (ECF No. 68-3 at 21-22). On June 12, 2016, he wrote that he was unable to write and eat and was now "crippled with a permanently disfigured arm and wrist." (*Id.* at 22). Medical staff did not respond to these requests. (*Id.* at 21-22).

On June 21, 2016, Plaintiff again asked to be taken to Ozark Orthopaedic for his wrist because he was in so much pain he could not sleep or anything. (ECF No. 68-3 at 23). He was told he would be added to nurse call. (*Id*). On June 22, 2016, Plaintiff asked for a splint, brace, bandage or something to help stabilize his wrist. (*Id.* at 24). He also asked someone to check into rescheduling his appointment at Ozark Orthopaedic. (*Id*). Finally, he indicated he was not getting as much pain relief medication as he had during his prior incarceration. (*Id*). On June 23, 2016, note was made that Plaintiff had not been seen by the caregiver because "provider is aware of detainee condition." (ECF No. 71-6 at 4-5). A separate notation that same day indicates he was not seen because it was a "past injury, referred to dr." (*Id.* at 5).

On June 25, 2016, he was told he would be placed on sick call. (ECF No. 68-3 at 24). On June 26, 2016, Plaintiff again asked for a splint or brace. (*Id.* at 25). Again on June 27, 2016, a note was made that Plaintiff was not seen because: "Provider is aware of wrist injury. This is not a new injury. See previous detention records. Will continue naproxen." (ECF No. 71-6 at 5).

On June 29, 2016, he was told he had been placed on sick call. (ECF No. 68-3 at 25). On June 30, 2016, note was made that Plaintiff was not seen by the caregiver because there were "no new orders." (ECF No. 71-6 at 6).

On July 1, 2016, Plaintiff submitted a request stating he had a broken wrist and was receiving only one aspirin a day. (ECF No. 68-3 at 27). He asked to see the doctor. (*Id*). On July 2, 2016, he was told he was added to the provider call list. (*Id*). On July 4, 2016, note was made that Plaintiff was not seen because Tylenol was ordered for 14 days. (ECF No. 71-6 at 7).

On July 7 and 8, 2016, Plaintiff again asked for a brace. (ECF No. 68-3 at 28). In response, he was told that they needed to get approval from the physician. (*Id*). On July 11,

2016, Plaintiff asked if they had obtained permission for him to have a brace. (*Id.* at 31). He stated he was in pain and the brace would help. (*Id*). On July 13, 2016, note was made that "[a] brace is not permitted in general population." (ECF No. 71-6 at 8). On July 20, 2016, Plaintiff submitted another request for treatment by an orthopedic doctor. (ECF No. 73-4 at 116).

Dr. Karas testified they generally did not give Naproxen or Tylenol for more than a week or two at a time. (*Id.* at 117). He noted it could cause liver damage. *Id.* Dr. Karas also indicated inmates could get Naprosyn (in the same category as Naproxen), ibuprofen, and Tylenol from the commissary. (*Id*).

Plaintiff was also booked into the WCDC on the following occasions: September 1, 2016, and released September 3, 2016 (ECF No. 68-2 at 43-44); September 4, 2016, and released September 6, 2016 (*Id*. at 47-53) (possible broken wrist noted); September 7, 2016, and released on September 30, 2016 (ECF No. 57-58). On September 9, 2016, Plaintiff asked for something to help with the nerve damage to his wrist. (ECF No. 74-6 at 14). He indicated he was suffering nerve pain and his wrist was broken in three places. (*Id.*).

On September 11, 2016, Plaintiff stated he could not climb to the top bunk because of his wrist and was sleeping on the floor. (ECF No. 74-6 at 14). He asked for a second mat. (*Id*). He stated he was suffering pain in his back, hips, and wrist. (*Id*). Plaintiff was told he would need to complete a request form for the second mat and it would be on the evening med cart. (*Id*). He was also asked where his records could be obtained about his wrist injury. (*Id*). Plaintiff replied that he had been locked up since April and had been asking for help for his wrist the entire time. (*Id.* at 15). He indicated he had been in pain and his wrist had now grown back together wrong. (*Id*). He said his wrist had been x-rayed multiple times including once at the detention facility. (*Id*). He indicated all his requests to see an orthopedic doctor were denied.

(*Id*).  He said it was inexcusable for them to leave him in pain and suffering.  (*Id*).  On September 14, 2016, Plaintiff was told there was "nothing else we can do about your condition.  We have you on pain meds.  This is all we can do at this time."  (*Id.* at 16).

On September 18, 2016, Plaintiff stated his aspirin had been taken away and he would like to be able to get aspirin or Tylenol when he asked for it for his broken wrist.  (ECF No. 74-6 at 19).  He stated they knew he was in pain almost constantly.  (*Id*).  In response, he was told he would be put back on Naproxen for his arm.  (*Id*).

On September 24, 2016, Plaintiff submitted a request stating his wrist was really hurting and he needed to see an orthopedic doctor.  (ECF No. 74-6 at 24).  He said he could not take the pain and asked to be taken to the hospital.  (*Id*).  On September 25, 2016, he submitted a request stating that his fingers were numb and his thumb felt like it was on fire he asked to be put on gabapentin.  (*Id*).  He also stated he was "hurting again."  (*Id*).  In response, he was told he was placed on doctor call.  (*Id*).  Plaintiff also asked for his arm brace from property.  (*Id.* at 25).  He was told he would have to request it through medical personnel.  (*Id*).  He was later notified that no brace was found in his property.  (*Id.* at 26).

Plaintiff testified he only saw Dr. Karas one time.  (ECF No. 71-1 at 79).  Plaintiff indicated KCH was short staffed and Dr. Karas was doing medical rounds himself.  (*Id.*).  Plaintiff testified Dr. Karas freaked out when he saw "my wrist and realized that he had made a huge mistake and I was out of jail like that with an appointment set."  (*Id*).  The "huge mistake" was not sending Plaintiff to an outside doctor.  (*Id*).  Plaintiff testified Dr. Karas never examined him.  (*Id*).

Dr. Karas testified that he never saw the Plaintiff during his earlier incarcerations but might have been in and out when other people were examining him.  (ECF No. 71-8 at 129).

Dr. Karas testified the only note he charted was on September 26, 2016, the last time Plaintiff was incarcerated, and he noted an obvious deformity and "a lot more increased pain." (*Id.* at 129-30).

Dr. Karas concluded it was time to send Plaintiff to an orthopedic doctor. (ECF No. 71-8 at 129). Dr. Karas also noted Plaintiff should be provided his brace from his personal property so long as it passed security. (*Id.* at 131). Dr. Karas also authorized Plaintiff to have Tylenol on an as needed basis. (*Id*).

Dr. Karas testified that he believes they cared for Plaintiff "as good as we could and we did him no long term harm." (ECF No. 71-8 at 99-100). Dr. Karas indicated that even with his patients at his clinics outside the detention facility he does not treat chronic pain with narcotics. (*Id.* at 100). He does prescribe narcotics for acute pain. (*Id*). If Dr. Karas had seen Plaintiff in one of his outside clinics, he would have told Plaintiff to follow the care plan provided by the ER which was to follow-up with an orthopedic doctor. (*Id.* at 102). When he was released, Plaintiff states he was given an appointment with Ozark Orthopaedic for October 6, 2016, which KCH had set up. (ECF No. 74-10 at 5).

On October 6, 2016, Plaintiff was seen by Dr. Henley at Ozark Orthopaedic. (ECF No. 74-9). Dr. Henley noted "visible deformity [was] present with the wrist in extension. His range of motion measures 50/35 in the right wrist and 60/80 in pronosupination." (*Id.* at 1). Dr. Henley's diagnosis was: "1. Right distal radius malunion extraarticular, 2. Right scaphoid waist fracture middle third nonunion." (*Id*). Dr. Henley referred Plaintiff to a pain management doctor and also ordered a "nerve test to reinforce a diagnosis of carpal tunnel syndrome." (*Id*).

Both operative and non-operative treatment options were discussed. (ECF No. 74-9 at 1). Plaintiff indicated he wanted his wrist fixed, but he understood it would never be normal. (*Id*).

Dr. Henley noted they might need to "add a carpal tunnel release to this surgery which would involve distal radius malunion correction on the right side plus ORIF scaphoid nonunion with bone grafting." (*Id*. at 3). Plaintiff was scheduled for surgery in late October, 2016. (ECF No. 74-10 at 7). Plaintiff did not, however, have the surgery. (*Id*).

Plaintiff was again incarcerated again from January 20, 2017, until April 11, 2017. (ECF No. 74-10 at 7). KCH made arrangements for Plaintiff to be seen by Dr. David Yakin at Advanced Orthopedic Specialists on February 8, 2017. (*Id*). X-rays showed "malunion of distal radius, healed out of position so the nerves are disrupted causing [Plaintiff's] fingers to go to sleep." (ECF No. 74-11 at 5).

Dr. Yakin indicated surgery would involve rebreaking the bone, using bone from Plaintiff's hip, and performing an illac crest bone graft. (*Id*). Dr. Yakin noted he would not be willing to do the surgery while Plaintiff was incarcerated "due to risk of infection and inability to wear a brace while [Plaintiff was] in jail." (*Id.* at 7).

Dr. Yakin ordered a nerve conduction study. (ECF No. 74-10 at 7). The study was conducted on February 27, 2017 by Dr. Michael Morse. (ECF No. 74-11 at 1). Dr. Morse concluded Plaintiff had a "[m]oderately severe right median nerve entrapment at the wrist." (*Id.* at 3).

Plaintiff retained Dr. Bruce Silverberg of Joplin Hand & Microsurgery Associates, Joplin, Missouri, as an expert. Dr. Silverberg's initial report is based on his review of medical records as he could not personally evaluate Plaintiff due to his incarceration. (ECF No. 68-10 at 2; ECF No. 74-13 at 1). Dr. Silverberg's initial written report states:

> "Upon a record review of this case, it seems evident from the initial records, that Gary Guilliams presented with a fracture displacement of the distal radius with reported intraarticular involvement. He would have been best managed within the first 2-3 weeks of injury, with procedural stabilization, directed to distal radius

reduction of the fracture and likely volar plate placement, within the first 2-3 weeks. This would have reduced the likelihood of mal-union and ulnar carpus impingement . . . . Without surgical reduction and fixation, within the initial 2-3 weeks, Gary would obviously suffer the consequences of mal-union, ulnar carpal bone impingement, carpal bone collapse and severe osteoarthritis of the wrist. A consequent later, limited or total wrist fusion would become necessary to relieve pain from carpal bone collapse. An initial operative management of the distal radius fracture could have been performed without bone grafting within the first 2-3 weeks."

(ECF No. 68-10 at 3-4).

With respect to Plaintiff's period of incarceration, Dr. Silverberg indicates that:

"a provision of ace wrapping alone, would have provoked considerable pain by the lack of stability to his wrist. He might have been prevented from the degree of distal radius recession and further displacement of the fracture margins. Nonetheless, with this degree of injury, he would have warranted surgical management, as reviewed above. He should not have been denied orthopedic review in April or any of the early months following his injury. These delays exacerbated his injury, deformity, arthritis, and more extensive considerations for later surgical management."

* * *

"It is my opinion, within a reasonable degree of medical certainty, that the WCDC restrictions and avoidance of legitimate orthopedic management and care, have caused significant consequence with short term healing and management, causing significant consequence and hardship for an already socially withdrawn and compromised individual."

(ECF No. 68-10 at 4-5).

In Dr. Silverberg's opinion Plaintiff will need:

"A bone osteotomy at the fracture site, to recreate the fracture, reduction with iliac crest bone grafting and volar as well as dorsal plating for the radius fracture. He will likely not achieve complete correction and will also need an ulnar recession osteotomy. The Scaphoid fracture, though old, has further displaced by delayed bone grafting and screw fixation. There is a much increased progression potential for carpal bone collapse, requiring limited and possible later complete wrist fusion. The prognosis at this time is guarded by the extent of surgery, the limited patient support with greater potential for serious complication, including infection, and disruption of surgical efforts. He likely has present limitations of motion and function, which would be improved but not completely resolved by surgical

intervention, at this time. He is likely never to engage in fully normal activities of contact, gripping, essential to the activities of daily living."

(ECF No. 68-10 at 4-5).

On April 21, 2017, Dr. Silverberg personally examined the Plaintiff. (ECF No. 71-2 at 4). Plaintiff reported having constant pain and dysfunction. (*Id*). He indicated he had "aching and sharp pains, radiating to his upper arm and shoulder" and "numbness for his right hand affecting all fingers." (*Id*). He described "burning dysesthesia for his hand and fingers," and he reported avoiding use of his right hand. (*Id*). He had not yet had surgery on his hand. (*Id.*).

Dr. Silverberg noted Plaintiff had limited motion and function of his right wrist. (ECF No. 71-2 at 5). Specifically, Plaintiff was "measured to 36 degrees of dorsal wrist flexion without volar flexion. He had no forearm rotation at this time." (*Id*). Plaintiff's grip strength was 10 pounds on the right and 80 pounds on the left. (*Id*). "Pinching was 2 and 17 lb respectively." (*Id*).

X-rays taken that day showed "severe right wrist injury and deformity." (ECF No. 71-2 at 5). Dr. Silverberg noted:

"There is a mal-union of the right distal radius with obvious intra-articular involvement, noting a 40-50 degree dorsal collapse, shortening, and consequent ulnar impingement into the wrist with obstructed forearm rotation, as well as limited wrist flexion. There is a collapse of the lunate with persistent fracture of the scaphoid noted as a prior chronic fracture, non-union before his initial altercation films. He has advanced pan-radial carpal arthritis, with an end stage DISI collapse pattern, (dorsal intercalated segment instability). There is a loss of carpal bone height. Based upon these X-rays, Gary is no longer a candidate for any kind of reconstruction or limited wrist fusion. He would be best directed to a total right wrist fusion or arthrodesis with fixation plate. To facilitate further forearm rotation, he would be directed to have further ulnar recession osteotomy, whereupon the ulna is shortened to eliminate wrist impingement and restricted forearm rotation and plate fixated.

Gary will additionally require median and ulnar nerve releases in the wrist area to improve sensation.

Gary Guilliams sustained a severe fracture of his right wrist with his February injury. The initial fracture was complicated and would have required extra-

ordinary efforts for reduction and fixation, so as to preserve form and length for his radius and wrist bone. Likely, this may have required both a volar and dorsal exploration and plate fixation with initial bone grafting. By the severity of his injury and complexity of the required operative reduction and fixation, he may well have had a poor recovery and healing functional result. Healing as he has, he has no present opportunity for correction of the severe arthritic changes, functional motion and recovery. The deliberate disregard of Gary's serious medical condition and fracture, without surgical correction has violated the standard of care for this problem and has, and will have significant life altering functional consequence for him."

(ECF No. 71-2 at 5-6).

According to Corporal Mulvaney, "[a]ll matters of judgment regarding health services are made within the sole province of the contract medical staff. No employee of the [WCDC] is authorized to make non-emergency medical decisions on behalf of any inmate." (ECF No. 68-1 at 3). The WCDC physician makes "[a]ll decisions regarding medications, medical testing, or medical treatment." (*Id*) (emphasis omitted). Corporal Mulvaney states the WCDC policy "is to not allow medical devices that could be used as a weapon from entering general population." (ECF No. 68-1 at 4). Medical devices are not prohibited outright. (*Id*). Corporal Mulvaney further states:

"In the event contract medical staff determines that a detainee requires a cast, brace, prosthetic device, wheel chair, or any other medical device that could potentially be used as a weapon in the detention center, efforts are made to place that detainee in administrative segregation to minimize the risk of the medical device being used as a weapon against detention center staff, medical staff or other detainees."

(*Id.* at 3-4); *see also* (ECF No. 68-6 at 3-4) (affidavit of Sheriff Helder); (ECF No. 68-5 at 3) (affidavit of Major Denzer).

Sheriff Helder indicates he relies on a chain of command to supervise employees in various divisions. (ECF No. 68-6 at 2). He states that Major Randall Denzer is the head of the jail's chain of command. (*Id*). According to Sheriff Helder, "[w]hen problems arise or are alleged, those

below me in the chain of command deal with and handle those problems to the extent they are able. I am generally not involved unless the problem is systemic or not capable of resolution by my staff." (*Id*). Sheriff Helder states he was not personally involved in any of the incidents referenced by the Plaintiff. (*Id*). He asserts he makes no decisions regarding medical care and is not familiar with Plaintiff's medical care. (*Id.* at 3).

Plaintiff never talked to Sheriff Helder. (ECF No. 71-1 at 65). Plaintiff believes Sheriff Helder is aware of his medical needs because Sheriff Helder "runs the jail." (*Id.* at 65-66). Plaintiff believes Sheriff Helder spoke with the jail doctor nearly every day. (*Id.* at 66-67). Plaintiff is of the opinion that Dr. Karas would have had to seek permission from Sheriff Helder to send Plaintiff to an outside doctor. (*Id.* at 69-70).

Major Denzer administers operations of the WCDC "pursuant to the policies and procedures implemented by the Sheriff." (ECF No. 68-5 at 2). He relies mainly on the captains to supervise detention center employees. (*Id*). He states he was not personally involved in any of the incidents at issue in this case. (*Id*). He asserts that he makes no "decisions or recommendations as to specific medical care provided to any particular inmate." (*Id*). He states he was not familiar with Plaintiff's medical care. *(Id)*.

With respect to Major Denzer, Plaintiff testified he ran the jail. (ECF NO. 71-1 at 70). Plaintiff felt Major Denzer should have made the doctor do something differently. (*Id*). Plaintiff felt anyone in the chain of command down to the nurses and the jailers he had contact with should be held responsible. (*Id.* at 71).

With respect to his official capacity claim, Plaintiff testified he felt that he was ignored because the Sheriff was not familiar with what was going on in the jail. (ECF No. 71-1 at 72). Plaintiff was able to obtain Medicaid coverage and had his surgery scheduled with Ozark

Orthopaedic for October 21, 2016. (ECF No. 71-1 at 23, 27; ECF No. 71-1 at 101). He decided, however, to seek treatment at Decision Point instead. (ECF No. 71-1 at 23, 27). He was afraid if he had the surgery right before he went to Decision Point that he would not be accepted as a patient there. (*Id.* at 25, 27-28). Plaintiff called to reschedule the surgery but just got voicemail and left a message. (*Id.* at 31). As of the date of the deposition, November 30, 2016, Plaintiff had not heard back from Ozark Orthopedic and the surgery had not yet been performed. (*Id*). Plaintiff testified he still intended to get his surgery done but it might be at Northwest Health. (*Id.* at 32). He testified his wrist still hurts all the time. (*Id.* at 34).

Dr. Karas testified that between 12,000 and 13,000 inmates come through the WCDC with a daily population of between 550 and 700 inmates. (ECF No. 71-8 at 23). KCH staffs the medical clinic at the facility 24/7, 365 days a year. (*Id.* at 25). KCH has between 15 and 20 full and part-time employees. (*Id*). There are usually three to eight employees working in the morning; three employees in the afternoon and evening; and, one employee overnight. (*Id.* at 26).

Monday through Friday there is generally a "provider" present at WCDC. (ECF No. 71-8 at 26). A provider can be a physician, physician's assistant, or nurse practitioner. (*Id*). Clinic hours are 9:00 a.m. to 6:00 p.m. Monday through Friday and 10:00 a.m. to 3:00 p.m. on Saturday. (*Id.* at 29). Landon Harris, a paramedic, is the medical administrator. (*Id*). Dr. Karas is the medical director. (*Id.* at 30). Dr. Karas testified they have not engaged in any quality assurance or utilization review of activities despite that being a provision in the contract. (*Id.* at 30-31).

Inmates are charged $5 for a provider visit; $3 for a nurse visit; $5 for prescription medication; and, $3 for over-the-counter medication. (ECF No. 71-8 at 39). The charges go on the inmate's commissary account. (*Id.* at 39-40). Any money collected by the commissary for medical expenses goes back to the facility. (*Id.* at 40). To Dr. Karas' knowledge inmates are not

charged for visits to outside physicians.  (*Id*. at 41).  The bill is paid out of the compensation pool.  (*Id*).  They cannot use an inmate's Medicaid or Medicare.  (*Id*).  Dr. Karas could not recall a situation where an inmate had other private insurance.  (*Id*).  If, however, an inmate is an ADC inmate, held for the U.S. Marshal Service, or held for another County, the medical care would be paid by them and not out of the compensation pool.  (*Id*. at 42).  Dr. Karas further clarified that they did not get billed for ambulance service and outside providers could only bill at the substantially lower Medicaid rates.  (*Id.* at 43).

KCH is paid a set amount per year for providing the medical services.  (ECF No. 71-8 at 33).  There is also a "compensation pool" which Dr. Karas described as the pool of general medical expenses the County had budgeted.  (*Id*).  In 2016, this amount was $150,000.  (*Id*).  If the total amount is not spent, half of the surplus goes to KCH and half to the facility.  (*Id.* at 33-34).  If more than $150,000 is spent, up to $100,000, KCH is liable for half of the overage and the facility is liable for half.  (*Id.* at 34).  In 2016, the compensation pool was exceeded by approximately $2,200.  (*Id*).

The compensation pool is used to pay for dental treatment, prescription medications, hospital visits, diagnostic testing such as offsite x-rays, MRI's and CT scans, outside specialists, medical supplies, testing equipment, and an EKG machine.  (ECF No. 71-8 at 34, 45-46).  KCH has monthly reports of the amounts spent out of the compensation pool.  (*Id*).  For facility employees, KCH provides TB tests, workers' compensation initial assessment and drug screenings, and pre-employment and academy physicals.  (ECF No. 71-8 at 36-37).

Dr. Karas testified that narcotic medications are administered only in cases involving acute trauma or severe pain.  (ECF No. 71-8 at 26).  Dr. Karas indicated it is the policy in most prisons not to use narcotics.  (*Id.* at 27).  He indicated there might be occasions where it would

be medically appropriate to prescribe a narcotic pain medication, but it is not done because of the facility's policies regarding narcotics. (*Id*). When an inmate is booked in, if he is not on medications and no medical complaints or concerns are noted on the computerized intake information, KCH would not see them. (ECF No. 71-8 at 63-64).

Mild orthopedic services such as sprains, knee pain, back pain, boxer's fracture, and splinting or partial casting of fractured bones are within the capability of KCH. (ECF No. 71-8 at 24-25, 44). If more is needed, inmates are sent to Ozark Othopaedic. (*Id.* at 44). If KCH determines an inmate needs outside treatment, arrangements will be made. (*Id.* at 28). Dr. Karas testified this occurs on at least a weekly basis. (*Id*).

## II.    LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d

621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution.  *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999).  The deprivation must be intentional, as mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

### A.  Provision of Medical Care in General

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs.  *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012).  To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132

F.3d 1234, 1239 (8th Cir. 1997)).  The Eighth Circuit applies the deliberate indifference standard to both pretrial detainees and convicted inmates.  *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).

To show that he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).  In this case, it is undisputed that Plaintiff had a serious medical need.

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation."  *Popoalii v. Correctional Medical Services,* 512 F.3d 488, 499 (8th Cir. 2008) (internal citation omitted); *see also Jackson*, 756 F.3d at 1065.  "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct."  *Popoalii*, 512 F.3d at 499.

It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation."  *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010) (internal quotation marks and citations omitted).  "[I]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment."  *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment."  *Id.*  Despite this, issues of fact exist when there is a question of whether or not medical staff exercised

independent medical judgment and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

"The Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis." *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (internal quotations omitted); *see also Jackson v. Riebold*, 815 F.3d 1114, 1119-20 (8th Cir. 2016); *cf. Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) ("A three-week delay in dental care, coupled with knowledge of the inmate-patient's suffering, can support a finding of an Eighth Amendment violation").

A Plaintiff "seeking to impose liability on a municipality [or an institution] under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." *Board of County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 403 (1997). "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." *Moyle v. Anderson*, 571 F.3d 814, 817-18 (8th Cir. 2009) (citation omitted); *see also Jenkins*, 557 F.3d at 633 (Plaintiff must point to "any officially accepted guiding principle or procedure that was constitutionally inadequate").

### B. Medical Defendants' Motion for Summary Judgment on the § 1983 Claim

The Medical Defendants argue that Plaintiff's Eighth Amendment claim fails because the undisputed material facts do not show any deliberate indifference to his serious medical needs.

Moreover, they claim they are entitled to qualified immunity. Finally, they claim there is no basis for an official capacity claim.

Specifically, with respect to Dr. Karas, the Medical Defendants argue that Dr. Karas reviewed Plaintiff's x-ray on April 12, 2016, and concluded Plaintiff's condition was non-emergent. Further, he concluded the damage had already been done to Plaintiff's wrist due to the lack of proper early treatment. Based on this, Dr. Karas maintains all decisions regarding the need for an orthopedic specialist, the type of pain medication to administer, and whether to provide a splint were all the exercise of medical judgment and as such are not evidence of deliberate indifference on his part.

Plaintiff argues it is indisputable that the Medical Defendants knew the Plaintiff had a serious medical need. Plaintiff points out he told them about his wrist injury; they observed his wrist; they obtained his medical records; and, they took an x-ray. Despite this knowledge, Plaintiff asserts the Medical Defendants refused to arrange for follow-up medical care with an orthopedic doctor, did not arrange for the recommended surgery, and refused to even provide him with a cast, splint, or other immobilizing device. Instead, Plaintiff states he only received Naproxen, Tylenol, ice, a mat, and an ace bandage for his pain. Plaintiff contends the Medical Defendants were also improperly motivated by financial considerations because Dr. Karas and KCH had a direct financial interest in minimizing expenditures for outside orthopedic care since those expenses came from the compensation pool. Plaintiff maintains that Dr. Karas' callous attitude regarding Plaintiff's injuries constitutes evidence of deliberate indifference on his part.

The Court agrees there is a genuine issue of material fact as to whether Dr. Karas exhibited deliberate indifference to Plaintiff's serious medical needs. Whether an injury is pre-existing and determined to be non-emergent or not, it is clear from the record that Plaintiff was suffering and

that his condition was worsening. Dr. Karas based his treatment plan solely on a review of the x-ray. He did not physically examine the Plaintiff until September 26, 2016. There is no evidence that Dr. Karas considered the fact that other physicians had deemed a referral to an orthopedic specialist necessary. There is nothing to suggest that once Dr. Karas concluded Plaintiff was suffering chronic pain that he considered other ways of addressing Plaintiff's pain. Dr. Karas appears to have followed the facilities' ban on narcotics without considering the fact that narcotic medication was prescribed by other physicians or whether some form of narcotic medication was necessary to treat the level of pain being suffered by the Plaintiff. Even the provision of a 24 hour mat and an Ace bandage was delayed. As surgery appeared inevitable, Dr. Karas also appears to have had a financial interest in avoiding having to pay for what would undoubtedly be an expensive surgery. Whether or not Dr. Karas deemed it appropriate for Plaintiff to see an orthopedic doctor or to have surgery, there is still a genuine issue of fact as to whether his delay in providing Plaintiff any form of relief that would have prevented deterioration of Plaintiff's condition constitutes deliberate indifference.

Dr. Karas also contends he is entitled to qualified immunity. "Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

Analyzing a claim of qualified immunity requires a two-step inquiry. *Jones v. McNeese,* 675 F.3d 1158, 1161 (8th Cir. 2012). "An official is entitled to qualified immunity unless (1) the

evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Robinson v. Payton,* 791 F.3d 824, 828 (8th Cir. 2015). "Unless the answer to both these questions is yes, the defendants are entitled to qualified immunity." *Krout v. Goemmer,* 583 F.3d 557, 564 (8th Cir. 2009).

As discussed above, the answer to the first inquiry is "yes." Viewed in the light most favorable to the Plaintiff, he has established a violation of his Eighth Amendment right to adequate medical care.

In determining whether the law was clearly established, the Court must examine the information possessed by the government official accused of wrongdoing in order to determine whether, given the facts known to the official at the time, a reasonable government official would have known that his actions violated the law. *Miller v. Schoenen*, 75 F.3d 1305, 1308 (8th Cir. 1996) (citation omitted). The law is clear that those held in detention have the right to adequate medical care. *Estelle*, 429 U.S. at 106. It is clearly established that a pretrial detainee has a right to have his complaints of severe pain evaluated and to some form of relief. *Dadd v. Anoka County*, 827 F.3d 749, 756-57 (8th Cir. 2016). It is clearly established that ignoring complaints about deficient medical care violates the Eighth Amendment. *Langford v. Norris*, 614 F.3d 445, 461-462 (8th Cir. 2010). It is also clearly established that delays in the provision of adequate medical care may support a claim. *Dadd*, 827 F.3d at 757. Thus, the answer to the second inquiry is also "yes." Dr. Karas is not entitled to qualified immunity.

The Court agrees with Plaintiff that there are genuine issues of fact that preclude summary judgment in KCH's favor. Plaintiff presented evidence that the KCH had a policy of not providing inmates with narcotic pain medication without evaluating the need for such medication on an

individual basis. This was true even when such medication had been prescribed by physicians who treated the inmate.

Further, Plaintiff presented evidence that KCH had a practice of interpreting the County Defendants' policy regarding the use of splints, braces, or casts, as a total ban on the use of such devices. This was true despite the existence of the specific contractual provision authorizing KCH to prescribe splints or braces. Plaintiff was told more than once in response to requests/grievances that braces or splints were not allowed.

The Medical Defendants are not entitled to summary judgment on the § 1983 claim.

### C.  County Defendants' Motion for Summary Judgment on the § 1983 Claim

The County Defendants contend they are entitled to summary judgment because no custom, policy, or practice of Washington County was the moving force behind the alleged violations of Plaintiff's constitutional rights. They point out that Plaintiff's sole claim against Washington County is based on the WCDC having a policy of not allowing casts, splints, or braces in the general population. These were only allowed for inmates assigned to segregation or a medical cell. The County Defendants point out that neither Dr. Karas nor KCH staff decided to order Plaintiff a cast or splint and have him placed in a medical cell.

The County Defendants also argue Plaintiff's claims fail because Plaintiff was not in the WCDC's custody long enough within the first two or three weeks following the injury for that policy to have any effect. They assert Plaintiff did not even request medical treatment when he was at the facility on March 7, 2016 or March 13, 2016. Finally, they note the undisputed evidence is that when Plaintiff was not incarcerated he removed the braces, splints, or wraps that had been provided to him by hospital personnel on more than one occasion.

In opposition, Plaintiff asserts that the County Defendants are attempting to gloss over the fact that Plaintiff's injuries became progressively worse over the nearly five months he was in jail. He points out that the injury progressed to a malunion of the bones. At a minimum, Plaintiff contends there is question of fact as to the whether the policy of not allowing detainees to wear splints or casts caused Plaintiff to suffer pain needlessly. Moreover, Plaintiff argues the County Defendants are responsible for creating and enforcing a policy that elevates security concerns over medical necessity and prevented KCH and Dr. Karas from providing Plaintiff with a splint or brace for his fractured wrist to protect it and minimize his pain.

The Court agrees with Plaintiff that there are genuine issues of fact that preclude summary judgment in the County Defendants' favor. As discussed above, Plaintiff presented evidence that the County Defendants had a custom or policy or precluding the use of splints, braces, or casts. While the County Defendants argue the policy was limited to inmates in general population, the Plaintiff has produced evidence suggesting the policy was not limited in that manner. Certainly, the Medical Defendants viewed it as an overall ban of the use of splints, braces, or casts. Plaintiff was told more than once in response to requests/grievances that braces or splints were not allowed.

With respect to the delay in treatment, Plaintiff has presented verifying medical evidence from which a reasonable trier of fact could conclude that the lack of, or delay in, treatment while Plaintiff was in the County Defendants' custody exacerbated the injury to Plaintiff's wrist. Specifically, Plaintiff has submitted: (1) x-ray evidence; (2) the opinion of his medical expert; (3) Dr. Karas testimony; and, (4) the nerve conduction study.

It would have undoubtedly been more advantageous had Plaintiff been able to obtain orthopedic intervention within the first couple of weeks following the injury; however, that does

not detract from the evidence suggesting that the delay in treatment while he was in custody at the WCDC adversely affected his condition and prognosis.

The County Defendants are not entitled to summary judgment.

### D. Medical Defendants' Motion for Summary Judgment on the AMMA Claim

With respect to the medical malpractice claim, the Medical Defendants claim it fails as a matter of law because Plaintiff has not put forth expert proof that Dr. Karas violated the standard of care in the locality in which he practices, or a similar locality, as required by the Arkansas Medical Malpractice Act (AMMA). Ark. Code. Ann. § 16-114-206. Plaintiff does not dispute the requirements of the AMMA; however, he said his expert is not foreclosed at this stage of the proceeding from providing the requisite testimony. Plaintiff argues his expert should not be prevented from testifying at trial as to the local standard of care.

The AMMA defines medical injury or injury as "any adverse consequences arising out of or sustained in the course of professional services being rendered by a medical care provider to a patient." Ark. Code Ann. § 16-114-201(3). An action for injury is defined to mean "all actions against a medical care provider, whether based in tort, contract, or otherwise, to recover damages on account of medical injury." Ark. Code Ann. § 16-114-201(1).

The AMMA sets forth the Plaintiff's burden of proof in any action whenever the "asserted negligence does not lie within the jury's comprehension as a matter of common knowledge." Ark. Code Ann. § 16-114-206(a). Specifically, Plaintiff has the "burden of proving [b]y means of expert testimony provided only by a medical care provider of the same specialty as the defendant, the degree of skill and learning ordinarily possessed and used by members of the profession of the

medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality." Ark. Code Ann. § 16-114-206(a)(1).[1]

It is therefore clear that to withstand the summary judgment motion, Plaintiff must provide proof in the form of expert testimony. *Eady v. Lansford*, 92 S.W.3d 57, 63 (Ark. 2002). Here, Plaintiff has offered no such proof that Dr. Karas violated the *appropriate* standard of care. Plaintiff argues he should not be precluded from offering such testimony at trial; however, that is precisely the purpose of a summary judgment motion, to determine if there are genuine issues of material fact for trial. Fed. R. Civ. P. 56(c). Plaintiff cannot withstand a summary judgment motion merely by arguing he may be able to meet his burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (court must assess the adequacy of the nonmovant's response and whether the party fails to make a showing sufficient to establish the existence of an element essential to its case and on which the party will bear the burden of proof).

## IV.     CONCLUSION

For the reasons stated, the County Defendants' Motion for Summary Judgment (ECF No. 66) is **DENIED.** The Medical Defendants' Motion for Summary Judgment (ECF No. 69) is **DENIED in part and GRANTED in part.** Specifically, it is granted with respect to the Plaintiff's Arkansas Medical Malpractice Act claim. It is denied with respect to the Plaintiff's § 1983 claim. This case will be scheduled for a jury trial.

IT IS SO ORDERED on this 5th day of February 2018.

*/s/ P. K. Holmes III*
P. K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE

---

[1] In *Broussard v. St. Edward Mercy Health System, Inc.*, 386 S.W.3d 385 (Ark. 2012), the Arkansas Supreme Court struck down the portion of this statute requiring that the expert testimony be provided by a medical care provider of the same specialty.